# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **CHERYL L. RASK**, | Case No.: 3:10-cv-01082-SI |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| **MICHAEL J. ASTRUE**, Commissioner of Social Security, | |
| Defendant. | |

SHARON MAYNARD
Bennett, Hartman, Morris & Kaplan, LLP
210 SW Morrison St., Ste. 500
Portland, OR 97204

      Of Attorneys for Plaintiff

AMANDA MARSHALL
United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902

TERRYE E. SHEA
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

      Of Attorneys for Defendant

**SIMON, District Judge,**

## I. INTRODUCTION

Cheryl L. Rask ("Ms. Rask") brings this action under 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits ("DIB"). The court has jurisdiction under 42 U.S.C. § 405(g).

Ms. Rask contends that the Commissioner: (1) erroneously evaluated medical evidence; (2) erroneously disregarded certain lay witness evidence; (3) made findings not supported by substantial evidence; and (4) failed fully to develop the record. The court rejects Ms. Rask's first three contentions: The Commissioner's decision thoroughly discussed all of the evidence and made findings that are supported by substantial evidence. The court, however, accepts Ms. Rask's argument that the Commissioner should have obtained additional evidence regarding the possibility that she suffers from a mental disorder. Accordingly, the Commissioner's decision is reversed and remanded for further proceedings. Specifically, the Commissioner should reopen the record for the limited purpose of obtaining additional evidence sufficient to determine whether Ms. Rask suffers from a somatoform or similar mental disorder. After obtaining additional evidence and testimony, the Commissioner should issue a new decision addressing whether Ms. Rask is disabled as a result of a somatoform or similar mental disorder.

## II. BACKGROUND

Ms. Rask worked as an interior architect from 1991 until 2003. Tr. 105, 889. On April 1, 2003, she was in a motor vehicle accident. Tr. 287. Since the accident, she has reported a variety of physical and mental impairments, including sensitivity to visual and audio stimulation, limited energy, and cognitive difficulties. Tr. 287, 891, 897. She was in a second motor vehicle accident

on August 2, 2005, which reportedly exacerbated her symptoms. Tr. 779. Ms. Rask attributes her

cognitive difficulties to either a traumatic brain injury or post-concussive syndrome, sustained

during the first accident. Tr. 104.

**A.    Procedural History**

On March 31, 2004, at the age of 35, Ms. Rask applied for DIB. Tr. 100-02. After the

Commissioner denied her application initially and on reconsideration, she requested a hearing

before an Administrative Law Judge ("ALJ"). Tr. 71-73, 79-80. ALJ Riley Atkins held hearings

on January 31, 2007, and March 12, 2007. Tr. 885-938. The ALJ denied Ms. Rask's claim on

March 27, 2007. Tr. 13-25. The Appeals Council declined review and the ALJ's decision became

the final decision of the Commissioner on August 22, 2007. Tr. 6-8.

Ms. Rask sought review in the District Court. *Rask v. Astrue*, No. 3:07-CV-1717-AC

(D. Or. Dec. 1, 2008). Before adjudication, however, she and the Commissioner stipulated that

her case be remanded to the ALJ so that additional evidence could be obtained and a new hearing

held. Tr. 978-80. The District Court entered an order to that effect, and the Appeals Council

vacated the Commissioner's final decision. Tr. 975-77, 984-87. The ALJ held a new hearing on

May 10, 2010. Tr. 1042-75. The ALJ issued a second decision on May 19, 2010, again denying

Ms. Rask's application. Tr. 942-60. Because the Appeals Council did not assume jurisdiction

after the ALJ's decision, that decision became the final decision of the Commissioner. 20 C.F.R.

§ 404.984(a); s*ee Petty v. Astrue*, 550 F.Supp.2d 1089, 1096 (D. Ariz. 2008) ("Because . . . the

Appeals Council has not assumed jurisdiction on its own motion, the ALJ's decision denying [the

claimant's] request for benefits constitutes a final decision for purposes of Section 405(g)

jurisdiction."). Ms. Rask then filed a new complaint in this court.

**B.      Medical and Other Evidence**

To establish that she is disabled and eligible for benefits, Ms. Rask "must produce complete and detailed objective medical reports of her condition from licensed medical professionals." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995); 20 C.F.R. § 404.1513(a). She may "use evidence from other sources to show the severity of [her] impairment(s) and how it affects [her] ability to work." 20 C.F.R. § 404.1513(d). Ms. Rask's chief alleged impairment is an "ongoing cognitive impairment from motor vehicle accidents that occurred in 2003 and 2005." Pl.'s Br. 1. The record reveals that Ms. Rask has sought treatment from or been assessed by more than 30 health care professionals. Tr. 113-15, 517-19, 529-32, 631-37, 694-704. The opinions of six doctors are relevant to her complaint to the court.

**1.      Dr. Curioso**

Dr. Evelyn Curioso, a neurologist, met with Ms. Rask for a consultation on June 27, 2003. Tr. 347. Ms. Rask told Dr. Curioso that another driver hit the rear of her car on April 1, 2003. Tr. 347. Ms. Rask "did not lose consciousness and did not have immediate pain. . . . She was able to get up and walk around[.]" Tr. 347. After the accident, however, Ms. Rask reported difficulty focusing and remembering recipes. Tr. 347. Dr. Curioso also noted that Ms. Rask "thinks her personality is a little bit changed." Tr. 347. Dr. Curioso recorded that "[o]n examination, her Mini-Mental Status State Examination is 30/30,[1] but she took so long doing serial 7s. Mental status is intact. Mood and affect are normal." Tr. 347. Dr. Curioso recorded an impression of post-concussive syndrome and recommended an MRI, electroencephalogram, and neuropsychological evaluation. Tr. 347.

---

[1]      A Mini-Mental Status Examination is a "commonly used assessment tool to quantify a person's cognitive ability. It assesses orientation, registration, attention, calculation, and language. Scoring is from 0 to 30, with 30 indicating intact cognition." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1474 (Donald Venes et al. eds. 2009).

Dr. Curioso saw Ms. Rask again on October 24, 2003, and April 5, 2004. Tr. 345-46. Her impression remained that Ms. Rask had post-concussive syndrome. After the consultation on April 5, 2004, Dr. Curioso recommended brain injury rehabilitation. Tr. 345.

**2.    Dr. Blakey**

Dr. William Blakey, a psychologist, performed a psychological assessment of Ms. Rask on December 3, 16, and 19, 2003. Tr. 285. In his report, Dr. Blakey recorded that Ms. Rask had experienced significant emotional distress in her past and, in 1997, intentionally took an overdose of Vicodin. Tr. 286. More recently, however, before her car accident, she "reportedly had a busy life." Tr. 286. Dr. Blakey noted that she had worked full-time and that "Mr. and Ms. Rask have friends and are very social."[2] Tr. 286.

Dr. Blakey wrote that Ms. Rask "has no memory of her head hitting anything" during the accident on April 1, 2003. Tr. 287. After the accident, Ms. Rask described several cognitive difficulties, including problems with her memory, comprehension, and emotional stability. Tr. 287. Dr. Blakey noted that Ms. Rask had seen a variety of health care professionals, including Dr. Curioso. Tr. 287. Dr. Blakey noted that Dr Curioso diagnosed Ms. Rask with post-concussive syndrome. Tr. 287.

Dr. Blakey administered a battery of psychological tests to assess Ms. Rask's intelligence, memory, mathematical fluency, reading comprehension, executive function, and personality. Tr. 289-93. Based on those tests, Dr. Blakey found that Ms. Rask "demonstrated problems with attention and concentration," had "problems with executive function," and "demonstrated some difficulty with" verbal fluency. Tr. 292. Those findings, he explained, supported a diagnosis of traumatic brain injury:

---

[2]    Mr. and Ms. Rask divorced on December 31, 2004. Tr. 896.

Ms. Rask has been diagnosed with Post-Concussive Disorder by her physician. This report suggests that Ms. Rask's symptoms are consistent with a Traumatic Brain Injury which appears to have resulted in a Postcussional Disorder. . . . Her profile is consistent with that of an individual with traumatic brain injury in that activities that are normally automatic have become more difficult, including many that are performed frequently throughout a normal day. Tr. 292.

Dr. Blakely qualified his assessment, however, by noting that "[t]his diagnosis assumes that the history and symptoms that Mr. and Ms. Rask reported are accurate. This writer [Dr. Blakey] did not have the opportunity to obtain or review Ms. Rask's medical records." Tr. 292. Dr. Blakey also noted that Ms. Rask's personality profile "presents a rather mixed pattern of symptoms in which somatic reactivity under stress is a primary difficulty." Tr. 291. He added, however, that "[t]his is not an uncommon profile in individuals who are actually having significant health concerns." Tr. 291.

Although Dr. Blakey did not review Ms. Rask's medical records, he found that the results from the tests he administered "support the diagnosis of a Traumatic Brain Injury resulting in Postcussional Disorder." Tr. 292. Dr. Blakey concluded by offering an axis I diagnosis of cognitive disorder not otherwise specified, no axis II diagnosis, and an axis III diagnosis of traumatic brain injury subsequent to severe whiplash.[3] He wrote that it "is difficult . . . to imagine [Ms. Rask] working at this time and this writer is of the opinion that she continues to be temporarily totally disabled." Tr. 293.

---

[3]    The American Psychiatric Association employs a "multiaxial" assessment system. Under the system, a doctor makes an assessment on each of five axes. Each axis "refers to a different domain of information that may help the clinician plan treatment and predict outcome." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 27 (4th ed. 2000) ("DSM-IV"). Axis I refers to clinical disorders; axis II to personality disorders; axis III to general medical conditions; axis IV to psychosocial and environmental problems; and axis V to global assessment of functioning. *Id.*

### 3.    Dr. Erb

Dr. Danielle Erb, a medical doctor and licensed physiatrist,[4] treated Ms. Rask from April

2004 until 2007. Tr. 878. Dr. Erb's "treatment . . . included education, counseling, and

coordination of care." Tr. 878. In her initial outpatient consultation with Ms. Rask in April 2004,

Dr. Erb recorded that Ms. Rask was "rear-ended" in a car accident one year earlier. Tr. 524.

Although, according to Dr. Erb's notes, she "did not hit her head during the accident,"

Dr. Curioso diagnosed her "with post-concussive syndrome." Tr. 524. Dr. Erb noted that an MRI

and electroencephalogram were performed, with "normal" results. Tr. 524. Dr. Erb also recorded

that findings from Dr. William Blakey's testing "were consistent with mild traumatic brain

injury." Tr. 524. Dr. Erb described Ms. Rask as "[s]omewhat verbose, but very articulate. . . .

Good eye contact. Able to follow simple requests without problems. With more complicated

requests she had some delayed processing." Tr. 526. At the close of her initial consultation

report, Dr. Erb diagnosed Ms. Rask with post-concussive syndrome. Tr. 526.

Dr. Erb saw Ms. Rask every month or two until July 2006. Tr. 520-27, 643-46, 775-96.

Dr. Erb's treatment notes reveal that initially Ms. Rask's condition improved. She noted on

August 9, 2004, for example, that Ms. Rask "[d]efinitely is improving." Tr. 520. On January 12,

2005, Dr. Erb noted that Ms. Rask "is doing more in her day. She is taking care of more

activities. She is noticing improvement in multiple areas." Tr. 788. Despite initial improvements,

however, Dr. Erb reported that a second car accident, which occurred in August 2005, had

caused a "relapse of [Ms. Rask's] previous condition or more of a regression of some of her

progress." Tr. 779. In October 2005, Dr. Erb reported that Ms. Rask "continues to have

difficulties with time management, energy and regrouping once she is off task." Tr. 780. In July

---

[4]        A physiatrist is a "physician who specializes in physical medicine." TABER'S
CYCLOPEDIC MEDICAL DICTIONARY 1782 (Donald Venes et al. eds. 2009).

2006, Dr. Erb recorded that Ms. Rask had failed in an attempt to return to her previous job, despite a significantly reduced schedule. Tr. 775. Dr. Erb stated that she appeared "fatigued but organized." Tr. 775. On March 14, 2006, Dr. Erb noted that Ms. Rask "does not have a mental disorder; she has sustained a traumatic brain injury in a motor vehicle collision." Tr. 777.

In a letter sent to Ms. Rask's attorney, Dr. Erb summarized her opinion of Ms. Rask's conditions and employment prospects. Tr. 878-89. She wrote that "Ms. Rask suffered two accidents in which she sustained a mild traumatic brain injury[.]" Tr. 878. Dr. Erb described Ms. Rask's symptoms, including poor stamina, over-sensitivity to audio and visual stimulation, and "great difficulty in executive functioning." Tr. 879. Dr. Erb opined that Ms. Rask "could probably work two hours per day, five days per week, doing a simple task like filing." Tr. 879. Even then, Dr. Erb wrote, "she would need to work in a room by herself, where she could control the lighting and the noise." Tr. 879. Dr. Erb concluded that she doubted Ms. Rask will "ever be able to work full-time." Tr. 879.

### 4.    Dr. Reiter

Dr. Gregg Reiter met with Ms. Rask for neuropsychological consultation on December 23, 2004 and January 1, 2005. In his report, he wrote that Ms. Rask "strongly believes that she has suffered brain injury and that it has resulted in multiple life changes." Tr. 694. Dr. Reiter administered a battery of memory, intelligence, verbal, motor skills, hearing, problem-solving, and emotional tests. Tr. 696-98. According to Dr. Reiter, the test results demonstrated that Ms. Rask was not suffering permanent impairment from a brain injury:

> M[s]. Rask has labeled herself as brain[-]injured and believes that while she is getting better, many symptoms continue. Results of this neuropsychological evaluation do not currently provide evidence of brain injury. Her performance on the comprehensive H[alstead] R[eitan] N[europsychological] B[attery] is entirely within the normal range. Performance across a wide series of tests was within the normal range as well, and a specific assessment of intellectual flexibility, a variable often seen as impaired in

> individuals with brain injury, was found here to be entirely within the normal range.
> While it is quite possible that M[s]. Rask did experience a post concussive syndrome as a
> result of her motor vehicle accident, it would now appear that in all likelihood, there has
> been no permanent impairment.  Tr. 698-99.

Although Dr. Reiter concluded that Ms. Rask was not then suffering from a brain injury, he

noted that one test, the Multiphasic Personality Inventory, suggested "the possibility of a

somatization disorder."[5] Tr. 698. He noted that the testing also suggested "a tendency toward

dramatization of symptoms." Tr. 698.

Dr. Reiter also completed several forms, provided by the Commissioner, corresponding

to Parts A-C of 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 12.00. Tr. 700-02. On these forms,

Dr. Reiter checked boxes indicating that he found no evidence of an organic mental disorder, and

that Ms. Rask had no restrictions on her activities of daily living, no deficiencies of

concentration, persistence, or pace, and no repeated episodes of decompensation.[6] Tr. 700-01.

Dr. Reiter also completed a two-page, check-box mental residual functional capacity evaluation.

Dr. Reiter marked responses indicating that he believed that Ms. Rask was not significantly

limited in any category. Tr. 703-04.

**5.    Dr. Greif**

Dr. Elaine Greif, a clinical psychologist, met with Ms. Rask for an initial psychology

consultation on November 12, 2004. Tr. 631. In her notes, she recorded that Ms. Rask's step-

---

[5]        A somatization disorder is a "condition of recurrent and multiple somatic
complaints of several years[] duration for which medical attention has been sought but no
physical basis for the disorder has been found. The disorder impairs social, occupational, or other
forms of functioning. . . . The unexplained symptoms are not intentionally feigned or produced."
TABER'S CYCLOPEDIC MEDICAL DICTIONARY at 2154-55.

[6]        Decompensation means the "[r]ecurrence or exacerbation of an illness, in
particular schizophrenia, because the mechanisms that had served to correct it are no longer
adequate to maintain an acceptable or desirable level of functioning." ROBERT JEAN CAMPBELL,
CAMPBELL'S PSYCHIATRIC DICTIONARY 255 (9th ed. 2009).

father and first husband had abused her and that she attempted suicide by overdosing in 1997.

Tr. 631. At the time of the consultation, however, Ms. Rask denied depression. Tr. 632.

Based on her interview with Ms. Rack, Dr. Greif found that Ms. Rask's alleged cognitive

deficits were not consistent with a concussion and were more likely "psychogenic."[7] Tr. 632.

Ms. Rask's activities, she wrote,

> revolve around disability – with many [doctor appointments], rehab, etc. [Ms. Rask's]
> reported symptoms are not consistent with what would be expected of [a] concussion like
> she may have had – i.e. gross deficits in all areas of life – and [her] presentation [is] not
> consistent with such deficits either. [Her c]urrent dysfunction looks primarily of
> psychogenic nature with abundant external reinforcement. Tr. 632.

Dr. Greif also noted that Dr. Blakey's tests had "reflected high endorsement of somatic

complaints." Tr. 632. In a note recorded on November 23, 2004, Dr. Greif stated that she told

Dr. Erb about Ms. Rask's "inconsistency in reported deficits/symptoms and what would be

predicted from injury even assuming [post-concussive syndrome]." Tr. 632. Dr. Greif recorded

that she was concerned that Ms. Rask's "focus on 'brain injury' and 'disability'" could "obstruct

[her] improved function." Tr. 632.

Like Dr. Reiter, Dr. Greif completed forms provided by the Commissioner corresponding

to Parts A-C of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. Tr. 633-35. Dr. Greif checked boxes

indicating that she found no evidence of an organic mental disorder, but commented that "[t]his

is a provisional . . . impression." Tr. 633. She also checked boxes indicating that she believed

Ms. Rask had no restrictions on her activities of daily living, no difficulties in maintaining social

functioning, and had experienced no episodes of decompensation. Tr. 634. Dr. Greif also

complete a two-page, check-box mental residual functional capacity evaluation. Although she

---

[7] Psychogenesis means "[o]rigination within the mind or psyche." CAMPBELL'S PSYCHIATRIC DICTIONARY at 803.

left four of the seventeen questions blank, in the ones she completed she marked responses indicating that Ms. Rask was not significantly limited. Tr. 636-37.

**6.    Dr. Debolt**

During the 2010 hearing, following the remand from the District Court, the ALJ called Dr. William Debolt to testify. Dr. Debolt, a neurologist, had not previously had any personal contact with Ms. Rask, but had reviewed her medical records. Tr. 1055-56. Dr. Debolt testified that he found no evidence in Ms. Rask's medical records to support a diagnosis of post-concussive syndrome. He testified that a

> concussion is a period of . . . impaired memory. That must be present in order to have a concussion. This record shows that that was not present at any time. The accident did not result in any head injury, bump to the head, goose eggs, cut to the head, or need for extracting her from the vehicle, or even going to an emergency room for a doctor's care for three days. Tr. 1058.

Dr. Debolt emphasized that Ms. Rask "wasn't knocked out [during her 2003 car accident]. She didn't have a memory problem. I just totally disagree with Dr. Curioso and Dr. Erb. There was no concussion." Tr. 1063.

Dr. Debolt also testified that there was no evidence that Ms. Rask had a traumatic brain injury. He explained that "to make the diagnosis of traumatic brain injury, there has to be some evidence of brain injury: MRI change, [electroencephalogram] change, neurological examination changes. All of these are absent in this case." Tr. 1060. He added that Ms. Rask's reported symptoms were "not from any organic neurological disease that I can see evidence of." Tr. 1070.

### III. DISABILITY DETERMINATION AND STANDARDS

**A.    Legal Standards**

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted

or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C.

§ 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining

whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v.*

*Comm'r*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520). The Keyser court

described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the
> claimant's impairment severe? (3) Does the impairment meet or equal one of a list of
> specific impairments described in the regulations? (4) Is the claimant able to perform any
> work that he or she has done in the past? and (5) Are there significant numbers of jobs in
> the national economy that the claimant can perform?

*Id.* at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).

The claimant bears the burden of proof for the first four steps in the process. If the

claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.

*Bustamante v. Massanari*, 262 F.3d at 949, 953-54 (9th Cir. 2001); *see Bowen v. Yuckert*, 482

U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. § 404.1520(g)

(setting forth general standards for evaluating disability).

The Commissioner bears the burden of proof at step five of the process, where the

Commissioner must show the claimant can perform other work that exists in significant numbers

in the national economy, "taking into consideration the claimant's residual functional capacity,

age, education, and word experience." *Tackett v. Apfel,* 180 F.3d 1094, 1100 (9th Cir. 1999). If

the Commissioner fails to meet this burden, then the claimant is disabled, but if the

Commissioner proves the claimant is able to perform other work that exists in the national

economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.

§§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99); 20 C.F.R. § 404.1566 (describing

"work which exists in the national economy").

**B.    The ALJ's Decision**

The ALJ applied the Commissioner's five-step sequential disability determination process set forth in 20 C.F.R. § 404.1520. The ALJ agreed that Ms. Rask was not engaged in substantial gainful activity and, consequently, she satisfied step one. Tr. 945.

At step two, the ALJ found that Ms. Rask suffered from a single severe impairment: "post concussive syndrome (PCS)." Tr. 945. The ALJ found that Ms. Rask's other "alleged impairments of 'traumatic brain injury (TBI)' and 'cognitive disorder not otherwise specified' are not severe as only the claimant has suggested those diagnoses to her doctor (Dr. Erb)[.]" Tr. 945. The ALJ added that Dr. Erb's diagnosis of traumatic brain injury "is not supported by any medical evidence, signs or clinical findings such as CT-brain scans, magnetic resonance imaging (MRI) or abnormal neurological examination findings[.]" Tr. 945. In addition, the ALJ noted that Dr. Blakey's diagnosis of cognitive disorder not otherwise specified was "based primarily on [Ms. Rask's] subjective report of symptoms." Tr. 947.

At step three, the ALJ found that Ms. Rask did not have an impairment or combination of impairments "that met or medically equaled one of the listed impairments[.]" Tr. 953. He explained that based "on all the medical evidence of record reflected in detail above, the undersigned finds . . . [that Ms. Rask] may have suffered a temporary post-concussion syndrome." Tr. 953.

The fourth and fifth steps require the ALJ to determine how the claimant's impairments affect her ability to perform work. To make this determination, the ALJ formulates the claimant's residual functional capacity ("RFC"). An RFC "is the most [claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). An RFC "is used at step 4 of the

sequential evaluation process to determine whether an individual is able to do past relevant work, and at step 5 to determine whether an individual is able to do other work, considering his or her age, education, and work experience." Social Security Ruling ("SSR") 96-8p.[8] The ALJ found that Ms. Rask retained an RFC for "light exertion with postural, environmental and vocational nonexertional limitations[.]" Tr. 954. This included the ability to "remember simple, routine type work instructions[.]" Tr. 958. In formulating Ms. Rask's RFC, the ALJ relied in part on a mental RFC evaluation completed by Dr. Dorothy Anderson, a psychologist who reviewed Ms. Rask's medical records, but did not examine her. Tr. 530-33. Dr. Anderson's report consisted of responses to check-box questions and some brief typed comments. She found that Ms. Rask had no significant mental limitations, except for some moderate limitations in the ability to remember detailed instructions, carry out detailed instructions, maintain attention for extended periods, and set realistic goals. Tr. 530-31.

After the ALJ has formulated the claimant's RFC, the ALJ must consider whether the claimant can, in light of that RFC, perform past or other work. To do so, the ALJ may rely on the testimony of a vocational expert ("VE"). 20 C.F.R. § 404.1560(b)(2); 20 C.F.R. § 404.1566(e). Typically, the ALJ asks the VE whether, given certain hypothetical assumptions about the claimant's capabilities, "the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy." *Burkhart v. Bowen*, 856 F.2d 1335, 1340 n.3 (9th Cir. 1988). In response, the "VE must identify a specific job or jobs in the national economy having requirements that the claimant's physical and mental abilities and vocational qualifications would satisfy." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162-63 (9th Cir. 2001).

---

[8]    The Commissioner publishes rulings to clarify the Social Security Administration's regulations and policy. *See Bunnell v. Sullivan*, 947 F.2d 341, 346 n.3 (9th Cir. 1991) (*en banc*). Although they do not carry the force of law, SSRs are binding on ALJs. *Bray v. Comm'r*, 554 F.3d 1219, 1224 (9th Cir. 2009).

The ALJ called a VE to testify at a supplemental hearing held on March 12, 2007.

Tr. 924-38. The ALJ and Ms. Rask's attorney posed several hypotheticals to the VE during the

hearing. Ultimately, the ALJ relied on the VE's response to a question regarding a "hypothetical

claimant" capable of light work with several mental and environmental limitations. Tr. 929-33.

Those limitations were based on Dr. Anderson's mental RFC assessment, Tr. 530-32, and

Dr. Erb's physical capacities evaluation. Tr. 640-41, 929-33, 958. They included a moderate

limitation in the ability to remember detailed instructions, carry out detailed instructions,

maintain attention for extended periods, and set realistic goals.[9] Tr. 930. In addition, the

hypothetical claimant was limited to following "simple instructions performing one, two step

tasks[.]"[10] Tr. 931. Finally, the hypothetical claimant had a "total restriction" on exposure to

heights, moving machinery, fumes, gases, dust, and marked changes in temperature and

humidity. Tr. 933.

The VE responded that a hypothetical claimant with those limitations and restrictions

would not be able to perform work similar to Ms. Rask's prior relevant work. Tr. 931. Such a

claimant would, however, be able to perform other work available in the national economy. The

VE identified two jobs: "assembly production" and "electronic assembly work." Tr. 931. The VE

noted that the restrictions on exposure to fumes, gases, and dust might reduce the total number of

available jobs, but that "[m]uch of the assembly work . . . is in a clean environment[.]" Tr. 933.

Based on the VE's testimony, the ALJ concluded that Ms. Rask "was capable of making

a successful adjustment to other work that existed in significant numbers in the national

---

[9]     Rather than list these limitations, the ALJ referred the VE to Dr. Anderson's mental RFC evaluation. Tr. 929-30.

[10]     The ALJ again referred the VE to Dr. Anderson's mental RFC evaluation. Tr. 931. He asked the VE "to consider the written comments" found on the third page. *See* Tr. 532.

economy." Tr. 959. Accordingly, the ALJ found that Ms. Rask was not disabled. Tr. 959.

## IV. STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

## V. DISCUSSION

In her brief to the court, Ms. Rask argues that the ALJ: (1) failed to provide specific and legitimate reasons to reject the opinions of some doctors; (2) failed properly to credit testimony from family members; (3) made findings at step five that are not supported by substantial evidence; and (4) failed to develop the record. Pl.'s Br. 3, 13, 16, 17. The court disagrees with Ms. Rask's first, second, and third arguments. The Commissioner's decision thoroughly discussed all of the evidence and made findings that are supported by substantial evidence. The court agrees, however, with Ms. Rask's fourth argument that the ALJ failed to develop the record. The court addresses that argument last.

### A.    Assessment of Medical Evidence

The ALJ "is responsible for resolving conflicts in the medical record." *Carmickle v. Comm'r*, 533 F.3d 1155, 1164 (9th Cir. 2008).  As part of that responsibility, the ALJ must determine the weight to give each source of evidence. 20 C.F.R. § 404.1527(d), (f). If the

opinion of a treating doctor, such as Dr. Erb, is contradicted by the opinions of other medical

sources, the ALJ may only reject that opinion if he provides "'specific and legitimate reasons'

supported by substantial evidence in the record[.]" *Lester v. Chater*, 81 F.3d 821, 830 (9th

Cir. 1995) (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)). The ALJ "'can meet

this burden by setting out a detailed and thorough summary of the facts and conflicting clinical

evidence, stating his interpretation thereof, and making findings.'" *Magallanes v. Bowen*, 881

F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

### 1. Dr. Erb's opinion

Dr. Erb opined that Ms. Rask suffered from post-concussive syndrome and traumatic

brain injury, was sensitive to audio and visual stimulation, had difficulty planning and

completing tasks, and was incapable of full-time work. Tr. 879. Her opinion, however, is

contradicted by the medical opinions of Drs. Greif, Reiter, and Debolt. Each of these doctors

concluded that Ms. Rask had not suffered permanent impairment from either a concussion or

traumatic brain injury. They also found that she largely did not have significant limitations in her

ability to perform work-related activity. Tr. 633-37, 700-04. To reject Dr. Erb's opinion, the ALJ

was required to provide specific and legitimate reasons supported by substantial evidence. He

provided those reasons. First, he found that Dr. Erb's diagnosis of traumatic brain injury was

based on Ms. Rask's own report. Tr. 945. This is a legitimate reason to reject a medical opinion.

*See Turner v. Comm'r*, 613 F.3d 1217, 1223 (9th Cir. 2010) (citing ALJ observation that doctor's

diagnosis was based on claimant self-reporting as legitimate reason to reject diagnosis).

Second, the ALJ observed that Dr. Erb's diagnosis of traumatic brain injury "is not

supported by any medical evidence, signs or clinical findings such as CT-brain scans, magnetic

resonance imaging . . . or abnormal neurological examination findings[.]" Tr. 945. Lack of

support in laboratory findings can diminish the weight of a medical opinion: The "ALJ need not accept a treating physician's opinion which is 'brief and conclusionary in form with little in the way of clinical findings to support its conclusion.'" *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986)); *see also* 20 CFR § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

Third, the ALJ found that Dr. Erb relied on Ms. Rask's unreliable descriptions of her symptoms. He explained that "Dr. Erb clearly was accepting of [Ms. Rask's] subjective, unsubstantiated claims, despite overwhelming medical evidence of record to the contrary." Tr. 956. The ALJ thoroughly discussed Ms. Rask's credibility and found that her descriptions of her symptoms were unreliable. *See* Tr. 955-57. An ALJ "may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999)).

Fourth, the ALJ concluded that Dr. Erb's conclusion that Ms. Rask was unable to return to full-time work was contradicted by Ms. Rask's activities of daily living. Tr. 951-52. The ALJ noted that Ms. Rask "performed extensive driving to her numerous doctor and therapy appointments" and was able to read and write e-mails to her vocational counselor. Tr. 951-52. The ALJ noted, for example, that Ms. Rask "composed a well written 10-paragragh letter to" her vocational counselors. Tr. 957. An ALJ may afford less weight to an opinion that is inconsistent with other evidence in the record. *Cf.* 20 C.F.R. § 404.1527(d)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

Finally, the ALJ noted that Dr. Erb's assessment of Ms. Rask's capabilities was

inconsistent with the observations in her treatment notes. The ALJ noted, for example, that

Dr. Erb described Ms. Rask "as an 'alert, pleasant woman who does not appear fatigued.'"

Tr. 953. Dr. Erb also noted that Ms. Rask came to appointments prepared with typed notes.

Tr. 953. An inconsistency between treatment notes and a medical source's conclusion is a valid

reason to discount the source's opinion. *See Saelee v. Chater*, 94 F.3d 520, 522-23 (9th

Cir. 1996) (ALJ properly cited inconsistency between treating doctor's treatment notes and his

report as reason to discount his opinion).

Notwithstanding these reasons, Ms. Rask argues that the ALJ did not adequately address

Dr. Erb's specific opinions about Ms. Rask's nonexertional limitations and ability to work full-

time. Those opinions, however, were dependent on Dr. Erb's impressions and diagnosis. As the

ALJ explained, much of Dr. Erb's medical opinion was based on Ms. Rask's own description of

her diagnosis and symptoms. Tr. 956. Moreover, the ALJ noted that Dr. Erb's conclusions were

not supported by independent medical tests. Tr. 945. These reasons undermine the foundation of

Dr. Erb's medical opinion and satisfy the ALJ's burden of "setting out a detailed and thorough

summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and

making findings." *Magallanes*, 881 F.2d at 751.

Finally, Ms. Rask argues that "[a]s a practical matter, the ALJ and Dr. Erb agree that

[Ms. Rask] sustained an injury that causes her cognitive limitations in a work environment." Pl.'s

Br. 9. Consequently, she contends that the ALJ's reasons for discounting Dr. Erb's opinion "are

irrelevant." Pl.'s Br. 10. Ms. Rask may be correct that the ALJ and Dr. Erb agreed that Ms. Rask

sustained an injury that causes some cognitive limitations. They clearly disagreed, however,

about the extent of those limitations. *See* Tr. 879, 954-960. Accordingly, the ALJ's reasons for

discounting Dr. Erb's opinion are not irrelevant. As explained above, the ALJ set forth specific

and legitimate reasons supported by substantial evidence to discount Dr. Erb's conclusions about

Ms. Rask's capacity for work.

### 2.    Dr. Blakey's opinion

The ALJ accorded Dr. Blakey's opinion "little weight in comparison to the objective

signs and clinical findings used in the non-diagnosis of any brain injury or neurological insult by

both Dr. Reiter and Dr. Greif." Tr. 948. As he did with respect to Dr. Erb's opinion, the ALJ

provided several specific and legitimate reasons to reject Dr. Blakey's opinion. First, the ALJ

noted that Dr. Blakey relied on Ms. Rask's description of her "alleged symptoms to render his

diagnosis[.]" Tr. 947. In fact, as the ALJ pointed out, Dr. Blakey admitted as much in his report.

Tr. 292, 947. Second, the ALJ recounted the results of Dr. Blakey's testing that showed

Ms. Rask had "'superior' perceptual-organization skills" and a "'mixed pattern of symptoms in

which somatic reactivity under stress is a primary difficulty.'" Tr. 947 (quoting Dr. Blakey at

Tr. 291). Finally, the ALJ compared Dr. Blakey's conclusions to Dr. Reiter's contrary

conclusions. He noted that Dr. Reiter also performed a battery of neuropsychological tests and

found no evidence to diagnose a mental disorder or traumatic brain injury. Tr. 947-48.

Ms. Rask nonetheless argues that these reasons are insufficient. In particular, she cites

Dr. Blakey's comment that the results of the tests he administered "themselves[] support the

diagnosis of a Traumatic Brain Injury resulting in Postcussional Disorder." Pl.'s Br. 12 (quoting

Dr. Blakey at Tr. 292). The ALJ, however, explained that Dr. Blakey's testing showed a mixed

picture, with Ms. Rask recording superior results in some areas and average or problematic

results in others. Moreover, the ALJ contrasted Dr. Blakey's test results with the results recorded

by Dr. Reiter that showed no basis for a diagnosis of traumatic brain injury. Ultimately, where,

as here, the medical evidence is susceptible to more than one rational interpretation, "it is the

ALJ's conclusion which must be upheld." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th

Cir. 1982).

**B.    Lay Witness Evidence**

Social Security regulations require the ALJ to consider all relevant evidence. 20 C.F.R.

§ 404.1545(a)(3). This includes evidence submitted by family members, such as Ms. Rask's

mother and ex-husband. 20 C.F.R. § 404.1513(d)(4); *Dodrill v. Shalala*, 12 F.3d 915, 918-19

(9th Cir. 1993) (family members competent to testify as to claimant's condition). Opinions from

other sources, such as family members, may be accorded less weight than opinions from

acceptable medical sources. *Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996). An ALJ,

however, may not disregard lay witness testimony "unless he or she expressly determines to

disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v.

Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

**1.    Ms. Ellis**

Ms. Rask's mother, Diane Ellis, completed a third-party function report and testified at

Ms. Rask's first hearing in January 2007. Tr. 146-154, 914-22. In her third-party report, Ms. Ellis

wrote, in part, that before the car accident, Ms. Rask was "very social" and "very organized."

Tr. 153. Afterwards, however, Ms. Rask "cannot read and comprehend recipes. She cannot do

calculations, and she doesn't have the energy to finish the food if she starts it." Tr. 153. During

the hearing, Ms. Ellis testified, in part, that if Ms. Rask was exposed to too much visual and

audio stimulation, Ms. Rask "just shuts down. She has to say, I've got to be qui[e]t. I've got to

go rest. I've got to take some time to recuperate." Tr. 918.

The ALJ expressly determined to disregard Ms. Ellis testimony. He explained that "[i]n

direct comparison to all the medical evidence of record reflected in detail above, I find the

testimony of the claimant and her mother not entirely credible." Tr. 957. He also explained that Ms. Ellis's "testimony is controverted by the cognitive testing revealing 'superior intellectual ability in the area of perceptual-organizational skills.'" Tr. 957 (quoting Dr. Blakey at Tr. 291). "One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence." *Lewis*, 236 F.3d at 511. Ms. Ellis's third-party function report and hearing testimony dealt primarily with Ms. Rask's cognitive functioning. The ALJ found that her evidence was in conflict with medically acceptable evidence disputing the existence of cognitive deficits. That is a germane reason to discount her evidence. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (affirming ALJ decision rejecting family member testimony that was inconsistent with medical record). The ALJ did not err in disregarding Ms. Ellis's evidence.

       **2.**      **Mr. Rask**

Ms. Rask also argues that the ALJ "failed to discuss Mr. Rask's observations at all." Pl.'s Br. 15. Kevin Rask is Ms. Rask's former husband. Tr. 288. Unlike Ms. Ellis, however, he neither submitted a third-party function report nor testified at a hearing. In fact, he did not directly offer any evidence at all. Instead, Dr. Blakey interviewed Mr. Rask as part of his psychological assessment of Ms. Rask. Tr. 288-89. As such, the observations he offered formed a portion of the basis for Dr. Blakey's opinion. The Ninth Circuit has never held that an ALJ must explicitly address evidence that is not offered directly to the Commissioner. Indeed, the regulations define "evidence" as "anything [the claimant] or anyone else submits *to us* [the Commissioner]." 20 C.F.R. § 404.1512(b) (emphasis added). Mr. Rask's observations about Ms. Rask were not submitted to the Commissioner; they were submitted to Dr. Blakey. The ALJ did not err in not addressing them.

**C.      Sufficiency of Evidence at Step Five**

Ms. Rask next contends that the "ALJ's Step 5 finding is not supported by substantial evidence[.]" Pl.'s Br. 18. At steps four and five, the ALJ considers a claimant's ability to return to either her past relevant work or to other work that exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(iv), (v). An ALJ may rely on the testimony of a VE to determine whether a claimant retains the ability to perform work. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). "Hypothetical questions asked of the vocational expert must 'set out all of the claimant's impairments.'" *Lewis*, 236 F.3d at 517 (quoting *Gamer v. Sec'y of Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)). In the event that an ALJ's hypothetical question fails to account for all the claimant's impairments, the "opinion of the vocational expert that [the] claimant has a residual working capacity has no evidentiary value." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).

Ms. Rask makes two arguments regarding the ALJ's hypothetical questions to the VE and the VE's response. First, Ms. Rask contends that the hypothetical question that the ALJ posed to the VE included a set of mental limitations that differed from the mental limitations he ultimately included in his formulation of her RFC. Pl.'s Br. 18-19.

During the hearing held on March 12, 2007, the ALJ asked the VE to consider a hypothetical claimant with "non exertional restrictions . . . [that] can be found at Exhibit 21F." Tr. 929. The ALJ then provided the VE with a copy of the exhibit. Tr. 929-30. Exhibit 21F is the mental RFC assessment completed by Dr. Anderson. The first two pages are a series of 20 questions with check-box responses. The third page includes room for written notes. Tr. 530-32. On page three, Dr. Anderson wrote that Ms. Rask "can remember locations and simple instructions" and "can perform simple 1-2 step tasks, would do best with predictable routine

OPINION AND ORDER – Pg. 23

tasks[.]" Tr. 532 (capitalization removed). When considering all of the restrictions in Exhibit 21F, including Dr. Anderson's written comments on page three, the VE responded that a hypothetical claimant would not be capable of performing Ms. Rask's past relevant work, but would be capable of performing other work available in the national economy. Tr. 931. In his formulation of Ms. Rask's RFC, the ALJ found, in part, that Ms. Rask "can remember simple work instructions and locations[.]" Tr. 958.

Ms. Rask argues that the "ALJ's mental RFC framed [her] limitations in terms of work instructions and locations" while Dr. Anderson's assessment, given to the VE, "stated limitations in terms of 'steps[.]'" Pl.'s Br. 19. This is error, she argues, because "[t]hese limitations are not comparable." Pl.'s Br. 19.

The court disagrees. Both the ALJ's formulation of Ms. Rask's RFC and Dr. Anderson's assessment described Ms. Rask as being capable of remembering simple instructions. The two assessments are not inconsistent merely because Dr. Anderson's assessment contained additional descriptive statements made in terms of steps. In any event, even if there is a small difference between Dr. Anderson's assessment and the ALJ's RFC formulation, Ms. Rask does not explain how that difference is material or amounts to a dispositive error. The ALJ's hypothetical question to the VE, based on Dr. Anderson's assessment, and the ALJ's ultimate formulation of Ms. Rask's RFC, are nearly identical. The ALJ's conclusion that Ms. Rask "was capable of making a successful adjustment to other work" was, therefore, supported by substantial evidence. Tr. 959.

Second, Ms. Rask argues that the two jobs identified by the VE, small products assembler and electrical component assembler, Tr. 959, require reasoning skills beyond what ALJ assessed Ms. Rask capable of performing. Pl.'s Br. 17-20. Ms. Rask begins by noting that the Dictionary

of Occupational Titles ("DOT")[11] indicates that both jobs require a reasoning level of two. DOT

reasoning level two requires an individual to be capable of "[a]pply[ing] commonsense

understanding to carry out detailed but uninvolved written or oral instructions. Deal with

problems involving a few concrete variables in or from standardized situations." DOT App. C

III.[12]

Ms. Rask argues that reasoning level two requires mental capacities greater than those the

ALJ described in his formulation of her RFC. Pl.'s Br. 19-20. The court disagrees. While

reasoning level two indicates that instructions are "detailed," the DOT qualifies that they are also

"uninvolved" and can be carried out with "commonsense understanding." As noted above, the

ALJ found that Ms. Rask could "remember simple, routine type work instructions and

locations[.]" Tr. 958. Moreover, other courts have consistently found that reasoning level two

corresponds to the ability to perform "simple, routine work tasks." *Soto-Rojas v. Comm'r*, Case

No. 09-6218-KI, 2011 WL 39141 *8 (D. Or. Jan. 6, 2011) ("DOT reasoning levels one and two

encompass an ability to perform simple, routine work tasks."); *see also Meissl v. Barnhart*, 403

F.Supp.2d 981, 984 (C.D. Cal. 2005) ("Someone able to perform simple, repetitive instructions

indicates a level of reasoning sophistication above" reasoning level one); *Hackett v. Barnhart*,

---

[11]     The DOT was published by the Department of Labor, and the latest edition, the Fourth, was last published in 1991. *See* Dictionary of Occupational Titles Fourth Edition, Revised 1991, http://www.oalj.dol.gov/libdot.htm. The Commissioner "has taken administrative notice of the Dictionary of Occupational Titles[.]" *Massachi v. Astrue*, 486 F.3d 1149, 1153 n.8 (9th Cir. 2007). The Commissioner relies "primarily on the DOT . . . for information about the requirements of work in the national economy. [The Commissioner] use[s] these publications at steps 4 and 5 of the sequential evaluation process." SSR-00-4p.

The DOT provides ratings for jobs corresponding to the relative level of skill required to perform them in a number of different categories. These categories include reasoning level, mathematical development, language development, and specific vocational preparation. *See* DOT, App. C, http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM

[12]     *See* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

395 F.3d 1168, 1176 (10th Cir. 2005) ("level-two reasoning appears more consistent with

Plaintiff's RFC," which describes an ability to perform "simple and routine work tasks").

## D.     Further Development of the Record

Finally, Ms. Rask contends that the ALJ failed to "properly develop the record regarding

[her] mental illness." Pl.'s Br. 16. She notes that three examining doctors, Drs. Blakey, Reiter,

and Greif, found evidence that her symptoms might be the product not of traumatic brain injury

or post-concussive disorder, but rather of a psychogenic or somatization disorder. Pl.'s Br. 16-17.

Despite that evidence, the ALJ did not subpoena the doctors or submit additional questions to

them concerning the possibility that Ms. Rask suffers from a somatoform disorder. [13]

Ms. Rask, however, never claimed that she was disabled on the basis of mental illness in

general or somatization disorder in particular. In her initial application for DIB, she listed her

"illnesses, injuries or conditions" as "subtle brain injury; post-concussion syndrome; head,

shoulder, back, neck, right leg, right arm [and] hand injured." Tr. 104. According to Dr. Greif,

Ms. Rask expressed "ambivalence" about Dr. Greif's impression that Ms. Rask's dysfunction

"looks primarily of psychogenic nature[.]" Tr. 632. Dr. Erb's treatment notes also suggest that

Ms. Rask did not endorse Drs. Reiter and Greif's conclusion that her symptoms were somatic or

psychogenic. *See* Tr. 777, 788-89. Even in her brief to the court, Ms. Rask contends – at least

primarily – that she is disabled on the basis of an "ongoing cognitive impairment." Pl.'s Br. 1.

Thus, Ms. Rask argues to this court that the ALJ erred in failing to obtain evidence

concerning an impairment that she is personally unwilling to claim or accept. Her argument

requires the court carefully to balance the burdens of the claimant against the duties of the

---

[13]     "Somatoform disorder" is a category of disorders, of which "somatization

disorder" is one variety. DSM-IV at 485.

Commissioner. The claimant must prove she is disabled. 20 C.F.R. § 404.1512(a); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) ("The claimant bears the burden of proving that she is disabled.").[14] The ALJ, however, "has an independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). This duty extends to represented claimants. *Id.*

In most cases, the court would not assign to an ALJ the duty to investigate potential diagnoses that the claimant does not suggest herself. It is reasonable for an ALJ to assume that a claimant is not impaired by a condition that she does not allege impairs her. *See, e.g., Wall v. Astrue*, 561 F.3d 1048, 1063 (10th Cir. 2009) (finding that ALJ did not err in not obtaining evidence concerning a condition that claimant did not allege); *Shidler v. Bowen*, 651 F.Supp. 1291, 1298 (N.D.Ind. 1987) (Claimant "was not under treatment nor taking any medication for a psychological problem. . . . Therefore, it was reasonable for the ALJ to conclude that plaintiff was not suffering from any disabling mental impairment[.]").

Ms. Rask's case, however, presents unusual circumstances. As noted above, *supra* note 4, somatization disorder is characterized in part by the sufferer's belief that his or her symptoms are real, even in the absence of a physical cause. *See United States v. Farmer*, 647 F.3d 1175, 1176 n.2 (8th Cir. 2011) ("sufferers perceive their symptoms as real"); DSM-IV at 486 ("unexplained symptoms . . . are not intentionally feigned or produced"). Consequently, if Ms. Rask suffers from a somatoform disorder, she may have avoided or disavowed the very examinations, consultations, and treatments that would have most fully supported her application.

---

[14]    While the claimant bears the burden of proving that she is disabled, neither the law nor regulations require that she correctly identify the specific condition causing her symptoms. *See, e.g., Jackson v. Bowen*, 873 F.2d 1111, 1113 (8th Cir. 1989) (holding that a specific diagnosis is not a prerequisite to granting disability benefits).

In light of that possibility, the ALJ had a heightened duty to develop the record. *Tonapetyan*, 242 F.3d at 1150 ("ALJ's duty to develop the record fully is . . . heightened where the claimant may be mentally ill and thus unable to protect her own interests."). This is even more so because the Commissioner has listed somatoform disorder in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.07. As such, the Commissioner recognizes that somatoform disorder is potentially "severe enough to prevent an individual from doing any gainful activity[.]" 20 C.F.R. § 404.1525(a). Somatoform disorder may not only explain many of Ms. Rask's symptoms, it may alone warrant a finding of disability.

The court, therefore, concludes that in the unusual circumstances of Ms. Rask's case, the ALJ should have obtained additional evidence concerning the possibility that she suffers from somatoform disorder. In remanding this case to the Commissioner, however, the court does not endorse the proposition that ALJs must always engage in open-ended investigations into every potential diagnosis suggested by the evidence. Nor does the court endorse the proposition that an ALJ must always rule out the possibility that somatoform disorder is responsible for a claimant's unexplained symptoms. In Ms. Rask's case, however, three doctors suggested the possibility of somatic or psychogenic symptoms. Similar medical evidence should be a threshold requirement for any claimant alleging that the Commissioner erred in failing to investigate the possibility of a somatoform disorder. *See* 20 C.F.R. § 404.1508 (a "physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms"). The ALJ's duty to develop the record is, as always, contingent upon the specific evidence, circumstances, and conditions of the individual claimant.

## VI. CONCLUSION

The court reverses the Commissioner's decision and remands the case to the

Commissioner. On remand, the Commissioner should reopen the record for the limited purpose of obtaining additional evidence sufficient to determine whether Ms. Rask suffers from a somatoform or similar mental disorder. The Commissioner should hold an additional hearing if necessary. After obtaining additional evidence and testimony, the Commissioner should issue a new decision addressing whether Ms. Rask is disabled as a result of a somatoform or similar mental disorder.

The Commissioner's decision is REVERSED and the case is REMANDED for further proceedings consistent with the instructions described above.

IT IS SO ORDERED.

Dated this 14th day of November, 2011

/s/ Michael H. Simon
Michael H. Simon
United States District Judge